# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
## EASTERN DIVISION

| | |
|---|---|
| IN RE: | |
| ROBERT G. LEUNG, | Chapter 7 |
|     DEBTOR | Case No. 05-18073-WCH |
| | |
| JOSEPH BRAUNSTEIN, CHAPTER 7 TRUSTEE, | |
|     PLAINTIFF, | Adversary Proceeding |
| v. | No. 07-1168-WCH |
| ROBERT G. LEUNG AND MARIA LEUNG, | |
|     DEFENDANTS | |

## MEMORANDUM OF DECISION

### I. INTRODUCTION

The matter before the Court is the Complaint filed by Joseph Braunstein, Chapter 7 trustee (the "Trustee"), against Robert G. Leung (the "Debtor") and his wife, Maria Leung ("Maria") (collectively, the "Defendants") through which he seeks to avoid the Debtor's payment of $90,000 to reduce Maria's loan obligation as a fraudulent or preferential transfer. For the reasons set forth below, I will enter an order awarding judgment to the Trustee.

### II. BACKGROUND

The facts are largely stipulated. On May 18, 1988, the Defendants purchased real estate located in Quincy, Massachusetts (the "Property") as tenants by the entirety for $210,000.[1] On September 9, 1998, the Defendants obtained a $72,000 Home Equity Line of Credit from

---

[1] Joint Pretrial Statement ("PTS"), Docket No. 30 at ¶ 2.6.

1

BankBoston, which later merged into Fleet Bank (the "Fleet Bank LOC").[2]  The Fleet Bank LOC was secured by a second mortgage on the Property.[3]

In 2000, the Debtor and his two partners (collectively, the "Partners") agreed to start a restaurant business.[4]  The Partners incorporated Miracle Century, Inc. as the owner and operator of the restaurant business.[5]  The Partners also established Miracle Century Realty Trust to hold a parcel of commercial real estate located at 497 Bedford Street, Abington, Massachusetts (the "Abington Real Estate"), which was used as the location of the restaurant.[6]  The Debtor received a 40% ownership interest in Miracle Century, Inc. and Miracle Century Realty Trust.[7]

The Partners obtained a $607,000 loan from Allied Capital (the "Business Loan") to partially finance the purchase price of the Abington Real Estate.[8]  As security, Allied Capital received a first mortgage on the Abington Real Estate, a first priority lien on the restaurant's assets, and a personal guarantee from each of the Partners.[9]  In addition to personally guaranteeing the Business Loan, between March 13, 2000 and December 11, 2000, the Debtor borrowed a total of $91,900 on the

---

[2] PTS at ¶ 2.7.

[3] *Id.* at ¶ 2.8.

[4] Deposition of Robert G. Leung, April 29, 2008 ("D-"), D-19, L 12-13.

[5] PTS at ¶ 2.15.

[6] *Id.* at ¶ 2.10.

[7] *Id.* at ¶ 2.24.

[8] *Id.* at ¶ 2.13; ¶ 2.14.

[9] *Id.*

Fleet Bank LOC to invest in the restaurant business.[10] The Debtor also incurred a significant amount of credit card debt in renovating and operating the restaurant and was only able to pay the minimum monthly balances through cash advances from other credit cards.[11] In total, the Debtor amassed over $700,000 in debt to invest in the business.[12]

On April 17, 2001, the Debtor transferred his interest in the Property to Maria for the stated consideration of $1.00.[13] The Debtor testified that when he conveyed his interest to Maria the business was going "downhill,"and Maria was "scared" and thought it would be beneficial if the Property was held solely in her name.[14] Maria then borrowed $197,000 from Countrywide Home Loans ("Countrywide").[15] She used $101, 921.12 of the proceeds to pay off the first mortgage on the property and $68, 203.55 to pay the Fleet Bank LOC.[16] On August 27, 2002, Maria obtained a $187,000 loan from Citizens Bank of Massachusetts ("Citizens"), secured by a mortgage on the Property.[17] The Debtor testified that he was not liable on the Note and that it was Maria's obligation.[18] Using the proceeds of the loan from Citizens, Maria paid the balance of the April 17,

---

[10] *Id.* at ¶ 2.12.

[11] D-32, L 5-24; D-33, L 1-17; D-51, L 8-21.

[12] Transcript of Hearing, June 25, 2008 ("T-"), T-10, L 15-17.

[13] *Id*. at ¶ 2.16.

[14] D-19, L 14-21.

[15] *Id.* at ¶ 2.17.

[16] *Id.*

[17] *Id.* at ¶ 2.18; D-29, L 14-16.

[18] D-15, L 16-18; D-29, L 14-16.

3

2001 loan from Countrywide.[19]

In early 2005, after learning that the Debtor's business partners intended to buy out his interest in the restaurant business, the Debtor contacted bankruptcy attorney Timothy Mauser.[20] Acting on the advice of Mr. Mauser, on February 16, 2005, Maria conveyed the Property to the Debtor and herself as tenants by the entirety for the stated consideration of $1.00.[21] The Debtor then recorded a Declaration of Homestead on the Property pursuant to Mass. Gen. Laws ch. 188, § 1.[22] On March 3, 2005, pursuant to a Stock and Trust Beneficial Interest Buyout and Transfer Agreement (the "Agreement"), the Debtor's business partners purchased the Debtor's ownership interest in Miracle Realty Century Trust and Miracle Century, Inc. for a cash payment in the amount of $90,000 (the "Monies").[23] The Debtor testified that the business was "underwater" when he was bought out.[24] Section 5 of the Agreement provided that Miracle Century, Inc. would indemnify the Debtor for any claims asserted against him "arising out of any debts, claims, actions, liabilities or other actions that were incurred by the Corporation or that were caused by the Corporation's actions[,]" excluding the Debtor's personal credit card debt.[25] The Debtor never received a release of his guarantee on the

---

[19] PTS at ¶ 2.19.

[20] T-9, L 16-25; T-10, L 20-25; T-11, L 1-3.

[21] Id. at ¶ 2.21; T-12, L 2-12.

[22] PTS at ¶ 2.23.

[23] Id. at ¶ 2.25.

[24] D-30, L 15-18.

[25] Plaintiff's Ex. 11.

4

Business Loan from Allied Capital.[26] On March 8, 2005, the Debtor transferred the Monies to Citizens to reduce the balance of Maria's obligation on the Note by $90,000 (the "Transfer").[27] The Debtor did not make any payments on his unsecured debt following his receipt of the Monies.[28]

On September 6, 2005, the Debtor filed for bankruptcy relief. On amended Schedule F – Creditors Holding Unsecured Nonpriority Claims, the Debtor listed $742,154.28 in general unsecured debt, including the $587,435.24 balance of the Business Loan from Allied Capital. On Schedule A – Real Property, the Debtor listed an interest in the Property, which he described as "TXE." He disclosed that the fair market value of the Property was $500,000 and his interest was $250,000. He also indicated that the mortgage on the Property was $85,000 and that his share of the mortgage was $42,500. He claimed in Schedule C – Property Claimed as Exempt, the Debtor claimed an exemption under Mass. Gen. Laws ch. 188, § 1 in the amount of $187,500. The Trustee objected to the Debtor's claim of exemption in the Property on the grounds that the Debtor's exemption had to be capped under 11 U.S.C. § 522(p) because the Debtor had acquired his interest in the Property within 1,215 days prior to his bankruptcy filing. On December 6, 2006, I sustained the Trustee's objection.[29]

On April 10, 2007, the Trustee filed a complaint against the Debtor and Maria seeking to avoid and recover the Transfer. I conducted a trial on June 25, 2008. At the trial's conclusion, I took

---

[26] D-27, L 6-7.

[27] PTS at ¶ 2.26.

[28] *Id.* at ¶ 2.29.

[29] My decision regarding the Debtor's exemption is set forth in *In re Leung*, 356 B.R. 317 (Bankr. D. Mass. 2006).

the matter under advisement. Both parties filed post-trial memoranda and the Trustee filed a Motion to Amend the Complaint to Conform with the Evidence to add a preferential transfer count. I granted the motion over the Defendants' objection on September 16, 2008. The Defendants' counsel is holding $95,000 in escrow to be paid to the Trustee to the extent the Trustee is awarded judgment.[30]

### III. POSITIONS OF THE PARTIES

The Trustee

The Trustee asserts that he may avoid the Transfer pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 548(a)(1)(B), as well as Mass. Gen. Laws ch. 109A, §§ 5 and 6. The Trustee alleges that there is compelling circumstantial evidence of fraudulent intent. Further, the Trustee alleges that the Debtor was insolvent at the time the transfer was made and did not receive reasonably equivalent value in exchange for his payment on Maria's obligation.

Additionally, the Trustee asserts that the Transfer was preferential under 11 U.S.C. § 547 and Mass. Gen. Laws ch. 109A, § 6(b). The Trustee argues that, even assuming the Debtor promised Maria he would pay her obligation on the Note, it would be avoidable because she received more than other unsecured creditors. Moreover, the Trustee contends that the Transfer was made on behalf of an antecedent debt, and that Maria, as an insider, knew that the Debtor was insolvent at the time of the Transfer.

Finally, as a further theory of recovery, the Trustee, relying on the laws of equity, contends that the Transfer unjustly enriched Maria because as the sole obligor on the Note, she received the entire benefit of the Transfer to the detriment of the Debtor and his estate.

---

[30] PTS at ¶ 2.33.

On these grounds, the Trustee seeks recovery of the amount avoided, plus accrued interest, from the funds Defendants' counsel is holding in escrow, rather than look to recovery under 11 U.S.C. § 550.

The Defendants

In opposition, the Defendants argue that the Debtor did not make the Transfer with fraudulent intent because he was engaging in permissible pre-bankruptcy planning by making use of the homestead exemption under Mass. Gen. Laws ch. 188, § 1. The Defendants further add that because the Transfer caused an equity increase in the Property that exceeded the Debtor's homestead cap, the Debtor's bankruptcy estate ultimately received the benefit of the pre-bankruptcy planning effort.

In response to the Trustee's constructive fraud claim, the Defendants contend that the Debtor received value from the Transfer because the Debtor enjoyed increased equity in the Property by that amount. The Defendants also assert that the Debtor made a promise to Maria to return the equity to the Property that was borrowed for the business. Moreover, the Defendants argue that the Debtor was not insolvent at the time of the Transfer because as a contingent debt, it is improper to use the full remaining amount of the Business Loan for purposes of determining whether the Debtor was insolvent. Rather, the Defendants urge me to subtract the entire amount of the debt from the Debtor's liabilities because, in retrospect, the Debtor never had to make payment on the guarantee and could have sought indemnification if he had to do so.

The Defendants additionally argue that Mass. Gen. Laws ch. 109A §§ 5 and 6 are inapplicable, and that unjust enrichment is unavailable where there is an adequate remedy at law.

IV. **ANALYSIS**

Section 548 of the Bankruptcy Code[31] sets forth the powers of a trustee in bankruptcy to avoid fraudulent transfers. It reads in relevant part:

> (a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily–
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. . . .[32]

In this case, the parties do not dispute that the Debtor voluntarily transferred an interest in property within one year of the petition date. The only remaining issue is whether the Transfer was demonstrative of actual or constructive fraud.

A transfer is avoidable on the basis of actual fraud if the transfer is made with "actual intent to hinder, delay, or defraud."[33] The law of this circuit regarding actual intent is well settled. Because "[i]t is often impractical, on direct evidence, to demonstrate an actual intent to hinder, delay or defraud creditors," courts may infer fraudulent intent from the circumstances of the transfer,

---

[31] All references to the Bankruptcy Code shall be to 11 U.S.C. § 101, et seq. as in effect prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23.

[32] 11 U.S.C. § 548.

[33] 11 U.S.C. § 548(a)(1)(A).

"taking particular note of certain recognized indicia or badges of fraud."[34] The United States Court of Appeals for the First Circuit observed:

> [T]he more common circumstantial indicia of fraudulent intent at the time of the transfer are (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.
>
> The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.[35]

Using the circumstantial indicia of fraudulent intent as guidance, I turn to the facts of the present case.

Looking at the circumstances of the Transfer itself, it is apparent that several badges of fraud are present. The matrimonial status of the Debtor and Maria encompasses the "special relationship" badge,[36] and Maria sufficiently qualifies as a transferee. Although the Monies were paid directly to Citizens, Maria, as the sole obligor on the Note, significantly and directly benefitted.

Moreover, the Debtor was insolvent at the time of the Transfer. Section 101(32) defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation. . . ."[37] Here, the Debtor's liabilities totaled $742,154.28,

---

[34] *Max Sugarman Funderal Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991).

[35] *Max Sugarman Funeral Home*, 926 F.2d at 1254-1255.

[36] *Id. citing In re May*, 12 B.R. 618, 627 (N.D.Fla.1980) ("family, friendship, or close associate relationship"); *In re Fitzpatrick*, 73 B.R. 655, 657 (Bankr.W.D.Mo.), aff'd in part and rev'd in part on other grounds (closer financial relationship between debtor and transferee than with other creditors).

[37] 11 U.S.C. § 101(32)(A).

a sum substantially greater than his assets consisting of his interest in the Property, valued at $500,000 and subject to a mortgage of $85,000, and personal property valued at $8,800. The Defendants cite *Covey v. Commercial Nat. Bank of Peoria*[38] for their contention that as a contingent debt, the Business Loan should not be included in the insolvency calculation. I disagree, however, because even if the Debtor had a valid claim for indemnification, there is not evidence before me showing that the Debtor's partners would have been able to satisfy such a claim. The facts, as the actually transpired, have no effect on the contingency of the Business Loan, which is measured at the time the Transfer was made. Thus, the Defendants' arguments that the Debtor was never called upon to answer the debt, or could have sought indemnification under the Agreement, are not considered.

Additionally, the Debtor retained the $90,000 following the Transfer, albeit in a different form, implicating another badge of fraud. Although the $90,000 was paid to Citizens, the equity in the Debtor's home was increased by $90,000. The Defendants argue that this retention of property is not representative of a badge of fraud, but rather is representative of permissible pre-bankruptcy planning to maximize the Debtor's homestead exemption. The Defendants overlook, however, that while converting nonexempt property into exempt property may be permissible, doing so fraudulently is not.[39] Indeed, pre-bankruptcy conversions are still subject to avoidance on the basis

---

[38] *See Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 659-660 (7th Cir.1992)("to find the value of a contingent liability a court must determine the likelihood that the contingency will occur.")

[39] *See e.g.*, *In re Wadley*, 263 B.R. 857, 860 (Bankr. S.D. Ohio 2001) (exception to pre-bankruptcy conversions where there is extrinsic evidence of fraud); *In re Kravitz*, 225 B.R. 515, 518 (Bankr. D. Mass. 1998) (exemption claim can be denied where there is fraudulent intent).

of fraud, measured by the same indicia of fraud *Max Sugarman* outlined.[40] As I have already observed the presence of several of these badges of fraud, I find the pre-bankruptcy planning defense unavailing. Accordingly, I find the Trustee may avoid the Transfer under 11 U.S.C. § 548(a)(1)(A).

In addition to transfers reflecting actual fraud, Section 548 permits the trustee to avoid transfers that are constructively fraudulent. A transfer is constructively fraudulent if the debtor received "less than a reasonably equivalent value in exchange for such transfer."[41] The gratuitous payment of Maria's obligation merely converted the $90,000 from cash into equity in the Property. This is not receipt of value at all, let alone reasonable equivalence. Therefore, having already found the Debtor was insolvent, I find the Transfer also satisfies the elements of constructive fraud pursuant to 11 U.S.C. § 548(a)(1)(B).

Having held that the Transfer was fraudulent under 11 U.S.C. §§ 548(a)(1)(A) and 548(a)(1)(B), it is not necessary for me to address the Trustee's arguments that the Transfer was fraudulent under Mass. Gen. Laws ch. 109A, preferential under 11 U.S.C. § 547, or unjust enrichment under the laws of equity[42]. Moreover, as funds have been specifically set aside in escrow to satisfy the Trustee's judgment award, reference to 11 U.S.C. § 550 and an analysis of the sources from which the Trustee may recover is unnecessary.

---

[40] *See e.g., In re Wadley*, 263 B.R. at 860.

[41] 11 U.S.C. § 548(a)(1)(B)(i).

[42] I note, however, that the equitable claim of unjust enrichment is available only in the absence of a remedy provided by law. *See In re McCabe*, 345 B.R. 1, 9 (D. Mass. 2006). Here, the Trustee has a remedy provided by law; namely, fraud under 11 U.S.C. § 548.

11

## V. **CONCLUSION**

In light of the foregoing, I will enter an order awarding judgment to the Trustee.

                                                             _____
                                                             William Hillman
                                                             United States Bankruptcy Judge

Dated: September 22, 2008